Opinion on Motion for Rehearing issued May 15, 2008










 









In The
Court of Appeals
For The
First District of Texas




NOS. 01-07-00994-CR




EDWARD GEORGE MCGREGOR, Appellant

V.

THE STATE OF TEXAS, Appellee




On Appeal from the 178th District Court
Harris County, Texas
Trial Court Cause Nos. 1137739




MEMORANDUM OPINION ON MOTION FOR REHEARING
          Appellant, Edward George McGregor, requests that we rehear an appeal from
a judgment that sets bail at $750,000 for the indictment for the offense of capital
murder for which the State is seeking the death penalty. We deny the motion for
rehearing, but we withdraw our opinion and judgment that issued April 10, 2008. We
substitute the following opinion for the April 10, 2008 opinion. In his sole issue,
appellant contends that the bail is excessive. We conclude that the record fails to
show that the trial court abused its discretion in setting the amount of bail. We
therefore affirm. 
Background
          Appellant is a 35-year-old man who has lived in the Houston area since he was
nine years of age. His parents, brother, grandmother, niece, aunts, uncles, and
cousins live in the Houston area. Until recently, appellant worked as a UPS truck
driver for 11 years. He has no prior felony convictions, but is a suspect in the deaths
of four women, including the complainant in this indictment, with whom he had
contact shortly before their deaths, which occurred over a 16-year span of time 
between 1990 and 2006.  
          Police officers’ interest in appellant began after Daniel Subjects died in August
2005. Subjects was a single, black woman found nude in her apartment. Her body
was draped over the edge of a partially water-filled bath tub with her head submerged
in the water, her knees on the bathroom floor, and articles of clothing wrapped around
her head. Her purse was found dumped, as if someone had rummaged through the
contents. An investigation of her cell phone records revealed that appellant was the
last person who called her before she was killed. Police officers who interviewed
appellant after Subjects’s death, informed him that they were interested in him
because his name came up in Subjects’s cell phone records. Although he was one of
the last people to speak to Subjects before her death, appellant was not charged with
her death.
          Six months later, in February 2006, Mandy Rubin was killed under similar
circumstances to those surrounding the death of Subjects. Like Subjects, Rubin was
a single, black woman found nude in her apartment with her body in the same
position as Subjects’s body and also with articles of clothing wrapped around her
head. Like Subjects’s purse, Rubin’s purse was found dumped, as if someone had
rummaged through the contents. The investigating police officers could not find
Rubin’s cell phone in her apartment or car, and it appeared to be the only thing
missing from her apartment. The officers obtained Rubin’s cell phone records, which
showed that someone had gone into her cell phone server and deleted the messages
after she was dead. Despite the efforts to conceal the messages, the officers’ search
of the cell phone records showed that a call from appellant was one of the last phone
calls she received before she was killed. Because appellant was one of the last people
to speak to Rubin before her death, Houston police officers interviewed appellant. 
Additionally, officers obtained a DNA sample from appellant and submitted it to
Identigene to get his DNA profile. Appellant was not charged with Rubin’s death. 
          After the deaths of Subjects and Rubin, appellant was charged in Fort Bend
County in May 2006 with the 1990 death of Kim Wildman, who was found nude in
her kitchen, dead from a stab wound. Within a statistical probability, appellant’s
DNA matched DNA found at the home of Wildman. Appellant acknowledged that
he was with Wildman shortly before her death, claiming that he had consensual sex
with her up until about 8:30 p.m. the night she was attacked. At the time of
Wildman’s death, appellant was 17 years of age and lived with his parents, who lived
a couple of houses from Wildman, an Anglo woman. The report of the 911 call from
Wildman documented that “the caller mentioned ‘stab’, ‘male’, ‘black’, and whom
she did not know, and ‘hurry’ and ‘dying’.”
           Some time after his arrest in May 2006, appellant posted a $250,000 bond for
his capital murder arrest for the death of Wildman. The bond amount was reached
after a bond reduction hearing at which appellant testified. Appellant said that he had
no equity in the house he had just purchased in Fort Bend County in April 2006. 
Appellant said that he had no vehicles. Appellant testified that he had a UPS Stock
Purchase Program for which UPS took about $250 out of his paycheck, but he had no
idea how much money was in that retirement account. He said that he could not
borrow against it or cash it out until he retired. He stated that he had no liquid funds
or assets he could use to make a bond. At the same hearing, appellant’s mother,
Sonia McGregor, testified that if they combined the resources of everyone in their
family, they “could try to come up with $5,000" to make a bond. However, after the
court set bond at $250,000, the bond was made by a premium paid by appellant’s
sisters and by their pledges of their house titles and 401K accounts. After he made
the bond, appellant complied with the conditions of the bond by appearing in court
and wearing a satellite leg monitor. That bond is still in effect.
          Within no more than eight months after making the bond for the Fort Bend
County charge, appellant was rearrested in December 2006 for a capital murder in
Harris County for the 1994 death of Edwina Barnum, the complainant in this case. 
Within a statistical probability, appellant’s DNA was determined to match the DNA
found in a used condom recovered in Edwina Barnum’s apartment, where she was
found dead.


 Like Subjects and Rubin, Barnum was a black female, living in an
apartment alone. As in Rubin’s case, Barnum was found with her wrists bound
behind her back. The killer placed a belt around Barnum’s neck to strangle her, and
then stabbed her through the belt into the neck. Similar to the Subjects and Rubin
cases, the contents of Barnum’s purse had been dumped in a manner that appeared as
though the purse had been gone through. Appellant denied that he knew Barnum. 
However, Barnum’s best friend told Officer Miller that Barnum knew appellant and
that they had been to parties together. The State indicted appellant for the offense of
capital murder of Barnum in the course of committing burglary or sexual assault of
Barnum, and it is seeking the death penalty.


 
          All four deaths share numerous similarities, but they are not identical. All the
women were found dead alone in their homes, and each had contact with appellant
shortly before death. Bleach was poured only over Subjects’s head. The hands of
Rubin and Barnum were bound with cords. Three of the four women were stabbed. 
Barnum was found in the bedroom, Wildman was in the kitchen, and the other two
women were found in the bathroom. Barnum wore a blouse and shorts, but the other
women were nude. In addition to being stabbed, Barnum was also shot and tasered
on the back. The purses of three of the women had been rifled through.
          The locales of the murder scenes and time periods were different in that Subject
and Rubin were killed in 2005-2006 in the southwest part of Houston, Barnum lived
off the Gulf Freeway and was murdered in 1994, and Wildman was murdered in Fort
Bend County in 1990. In addition, although the DNA evidence connects appellant
to the deaths of Barnum and Wildman, no other physical evidence, such as hair, fiber,
or fingerprints, connects him to the four offenses. Further, there were other suspects
in the deaths of each of these women. Police officers at one point targeted Subject’s
estranged husband as a suspect because someone thought that he saw him leave the
scene shortly before her body was discovered. As to Rubin, the police had a security
guard as a suspect, and the offense report in that case said that the security guard did
not pass a polygraph test. In the Barnum case, the police had numerous suspects,
including the boyfriend of one of Barnum’s girlfriends. He was thought to have
become enraged by a suspected lesbian affair between Barnum and the girlfriend. 
          The trial court initially set bond for the indictment for the death of Barnum at
one million dollars, but reduced the bond to $750,000. At the November 2007 bond
reduction hearing, appellant’s mother Sonia testified that, as a result of the publicity
from the Fort Bend County case, UPS fired appellant and he was unable to get
retirement or pension benefits from UPS. Sonia testified that she believed that she
and her family could raise the $5,000 it would take to make a $50,000 bond. Sonia
further stated that appellant has no equity in the house he bought and that he owns no
vehicles, planes, boats, stocks, bonds or other assets that he could use to make the
bond. Sonia told the court that she would do everything she could to assure
appellant’s appearance in court if he made the bond, and she had no doubt he would
appear in court. Appellant has been incarcerated since December 1, 2006. 
Standard of Review
          The standard for reviewing bail settings is whether the trial court abused its
discretion. See Ex parte Rubac, 611 S.W.2d 848, 849, 850 (Tex. Crim. App. 1981);
Ex parte Ruiz, 129 S.W.3d 751, 753 (Tex. App.—Houston [1st Dist.] 2004, no pet.). 
In the exercise of its discretion, a trial court should consider the following factors in
setting a defendant’s bail:
1.The bail shall be sufficiently high to give reasonable assurance
that the undertaking will be complied with.
 
2.The power to require bail is not to be so used as to make it an
instrument of oppression.
 
3.The nature of the offense and the circumstances under which it
was committed are to be considered.
 
4.The ability to make bail is to be regarded, and proof may be taken
upon this point.
 
5.The future safety of a victim of the alleged offense and the
community shall be considered.

Tex. Code Crim. Proc. Ann. art. 17.15 (Vernon 2005); see Ludwig v. State, 812
S.W.2d 323, 324 (Tex. Crim. App. 1991) (noting that court is “to be governed in the
exercise of [its] discretion by the Constitution and by the [article 17.15 factors]”). 
The burden of proof is upon a defendant who claims bail is excessive. Rubac, 611
S.W.2d at 849; Ex parte Martinez-Velasco, 666 S.W.2d 613, 614 (Tex.
App.—Houston [1st Dist.] 1984, no pet.). In reviewing a trial court’s ruling for an
abuse of discretion, an appellate court will not intercede as long as the trial court’s
ruling is within the zone of reasonable disagreement. Ex parte Beard, 92 S.W.3d 566,
573 (Tex. App.—Austin 2002, pet. ref’d) (citing Montgomery v. State, 810 S.W.2d
372, 391 (Tex. Crim. App. 1991)). But an abuse of discretion review requires more
of the appellate court than simply deciding that the trial court did not rule arbitrarily
or capriciously. Montgomery, 810 S.W.2d at 392; Beard, 92 S.W.3d at 573. The
appellate court must instead measure the trial court’s ruling against the relevant
criteria by which the ruling was made. Montgomery, 810 S.W.2d at 392; Beard, 92
S.W.3d at 573. The primary purpose for setting bond is to secure the presence of the
defendant in court at his trial. Ex parte Vasquez, 558 S.W.2d 477, 479 (Tex. Crim.
App. 1977); Ex parte Bonilla, 742 S.W.2d 743, 744 (Tex. App.—Houston [1st Dist.]
1987, no pet.).Analysis
          In his sole issue, appellant challenges the $750,000 bail amount as excessive. 
To determine whether the trial court abused its discretion in setting the amount of
bail, we apply the required five factors. Tex. Code Crim. Proc. Ann. art. 17.15; see
Ludwig, 812 S.W.2d at 324.
1. Sufficient Bail to Reasonably Assure Appearance
          The $250,000 bond in Fort Bend for the capital murder allegation was
sufficient to cause appellant to appear in court for all of his court appearances during
the less than eight months time that appellant was out on bond for that case. 
However, the record shows that since appellant made that bond, circumstances have
changed. First, appellant is now charged with two capital murders for the deaths of
Barnum and Wildman for both of which there is DNA evidence. Second, appellant
is now charged with an offense for which the State is seeking the death penalty, as
compared to the earlier possibility of only a single life sentence. Third, the possible
punishment evidence is evidence of appellant’s connection to four murders of women
who were killed in violent acts. Although the $250,000 bond was sufficient to result
in appellant’s appearance in court for a period of time of less than one year, the
changed circumstances suggest that the bond would have to be higher than that to
reasonably assure appellant’s appearance in court. We conclude the court could have
reasonably concluded a bond greater than $250,000 was required to reasonably assure
appellant’s appearance in court when required.
2. Power to Require Bail Not to be Used as an Instrument of Oppression
          The amount of bail should be set sufficiently high to give reasonable assurance
that the accused will comply with the undertaking, but should not be set so high as
to be an instrument of oppression. Ex parte Bufkin, 553 S.W.2d 116, 118 (Tex. Crim.
App. 1977); Ex parte Willman, 695 S.W.2d 752, 753 (Tex. App.—Houston [1st Dist.]
1985, no pet.). Although appellant presented some evidence of limited financial
ability, the trial court could have reasonably determined that the evidence lacked
credibility, because appellant and his family claimed appellant only had resources to
make a $50,000 bond, but they instead made a $250,000 bond for the accusation in
Fort Bend. Furthermore, appellant worked at UPS for over 10 years, had $250
deducted from his paychecks to participate in the UPS Stock Purchase Program, and
had a retirement account in an unknown amount, although he claimed he could not
obtain these funds. The State is seeking the death penalty for the capital murder of
Barnum, which requires a life sentence as the only other possible punishment. The
State’s evidence includes the violent deaths of two women who were linked to
appellant through DNA evidence and the violent deaths of two additional women
linked to appellant through telephone records that show he had contact with them
shortly before they were killed. Further, the State’s evidence shows similarities in the
deaths of the four women. Given the lack of credible evidence about appellant’s
resources and the aggravating circumstances involved in the offense and possible
punishment, we cannot conclude that the bail amount was used as an instrument of
oppression.           
3. Nature of Offense and Circumstances of Commission
          Appellant contends that the evidence to connect him to the offense is limited
only to DNA evidence that could have been placed there under circumstances that
would not include his guilt for capital murder. Also, appellant asserts that there is
evidence that in the Barnum investigation there were multiple other suspects
including a boyfriend of Barnum’s girlfriend. Further, no evidence in the bond
hearing showed that anyone forcefully entered Barnum’s apartment or that Barnum
was sexually assaulted.
          Although appellant challenges the evidence of his identity as the person who
caused the death of Barnum, the DNA evidence shows within a statistical probability
that his DNA was in the used condom found when Barnum was discovered dead in
the apartment. The evidence presented at the bond hearing showed Barnum was
brutally murdered, having been strangled, stabbed, shot, and tasered. Her dead body
was found with her hands tied behind her back. Although appellant denied that he
knew Barnum, Barnum’s best friend reported that Barnum had socialized with
appellant and appellant’s DNA was found in Barnum’s home where she was found
dead.
           In considering the nature of the offense, it is proper to consider the possible
punishment. Ex parte Vasquez, 558 S.W.2d at 479–80. The State’s punishment
evidence would likely show three extraneous murders of women killed with similar
violence. The State is seeking the death penalty, but even if the jury rejected the
death sentence, the only other possible sentence for capital murder is confinement for
life in prison. See Tex. Pen. Code Ann. § 12.31(a) (Vernon Supp. 2007). The nature
of the offense warrants a high bond due to the extreme violence in the way Barnum
was killed, the violence involved in the other death linked to appellant through DNA
evidence, and the other two violent deaths linked to appellant circumstantially.
4. Ability to Make Bail
          Appellant contends that he has no equity in his house and no liquid assets. 
After his arrest in Fort Bend, according to appellant’s family, he lost his job and
retirement and pension benefits. For these reasons, appellant’s family asserts that the
biggest bail that they can make based on the family members’ cumulative resources,
which amounts to a total of $5,000, is a bond in the amount of $50,000. The trial
court, however, could properly have discredited that testimony based on the making
of the bond in Fort Bend. As here, at the May bond hearing in Fort Bend, appellant’s
family represented that they could only come up with $5,000 total from their
combined resources to make a maximum bond of $50,000. Although the family
testified that their resources were limited to making a $50,000 bond, the family
instead had sufficient resources to make a bond at five times that amount. Given the
past misstatements about the financial resources available to appellant, the trial court
could have reasonably determined that appellant had access to funds from his
investments in the stock purchase program, the retirement account, the investment in
the house he purchased, or other undisclosed funds.
          We also note that although ability to make bail is a factor to be considered,
ability alone, even indigency, does not control the amount of bail. Ex parte
Charlesworth. 600 S.W.2d 316, 317 (Tex. Crim. App. 1980); Ex parte Hulin, 31
S.W.3d 754, 759 (Tex. App.—Houston [1st Dist.] 2000, no pet.). We conclude that
the information about appellant’s resources does not conclusively show that he cannot
make a $750,000 bond and that in this capital murder case, factors other than his
ability to make bail are more pertinent to the disposition of the appeal.
5. Future Safety of the Community
           Although appellant has no prior felony convictions, he is accused of two
capital murders in the violent deaths of two women, in addition to being suspected
of causing the deaths of two other women during a 16-year period of time between
1990 and 2006. We conclude that the trial court could have reasonably determined
that appellant posed a significant risk to the future safety of the community. 
6. Other Factors
          Courts should also consider the defendant’s work record, family ties, residency,
criminal record, and conformity with previous bond conditions. Rubac, 611 S.W.2d
at 849. Consideration of these factors alone favors a lower bond for appellant, as
these factors show that he was employed for 11 years before his arrest, has strong
family ties to an extensive extended family in the Houston area, is a long-time
resident of the Houston area, has no prior felony convictions, complied with the
provisions of the bond he posted in Fort Bend County, and he recently purchased a
home here. All these factors favor reducing the bond. However, courts should also
consider aggravating factors involved in the offense. See id. at 850. The aggravating
factors weigh heavily in favor of the higher bond. As described in detail above,
shortly before their deaths, appellant had contact with each of the four women who
were killed in violent deaths. There can be no more serious aggravating factor than
multiple murders. Although some factors point towards a lower bail, the aggravating
factor outweighs those considerations. Conclusion
          Although some circumstances point toward a lower bond for appellant, the
aggravating circumstances warrant a higher bond, particularly in light of the lack of
credible evidence about appellant’s financial resources. Appellant is indicted for
capital murder for the violent death of Barnum, an offense for which the State seeks
the death penalty. Furthermore, the punishment evidence would likely include
appellant’s connection to the deaths of three other women killed in violent deaths. 
Although the $250,000 bond was sufficient to result in appellant’s appearance in
court for a period of time less than one year, the changed circumstances suggest that
the bond would have to be higher than that to reasonably assure appellant’s
appearance in court. We also note that the trial court could reasonably have
suspected the credibility of the financial information provided by appellant and his
family since they misrepresented to the Fort Bend trial court that they could only
make a $50,000 bond in the Fort Bend charge when they instead were able to make
a $250,000 bond. The trial court could have determined that appellant and his family
were not forthcoming about the extent of appellant’s financial resources. We hold
that the trial court’s decision to leave the bond at $750,000 is not outside the zone of
reasonable disagreement. See Ex parte Davis, 147 S.W.3d 546, 553 (Tex.
App.—Waco 2004, no pet.) (finding that $750,000 bail appropriate in murder case
after application of article 17.15 factors). We overrule appellant’s issue and affirm
the trial court’s judgment.
          
Elsa Alcala
Justice
Panel consists of Justices Taft, Keyes, and Alcala.
Do not publish. See Tex. R. App. P. 47.2(b).